Dana M. Johnson
NORTHERN ROCKIES JUSTICE CENTER, PLLC
P.O. Box 9623
Moscow, ID 83843
Tel: (208) 874-3158
johnsondanam@northernrockiesjusticecenter.org
(*pending admission pro hac vice*)

Rebecca K. Smith
PUBLIC INTEREST DEFENSE CENTER, P.C.
P.O. Box 7584
Missoula, MT 59807
Tel: (406) 531-8133
publicdefense@gmail.com

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | |
|---|---|
| ALLIANCE FOR THE WILD ROCKIES & NATIVE ECOSYSTEMS COUNCIL, )<br><br>        Plaintiffs, )<br><br>    vs. )<br><br>VICKI CHRISTENSEN, Interim Regional Forester of Region One of the U.S. Forest Service, UNITED STATES FOREST SERVICE, an agency of the U.S. Department of Agriculture, UNITED STATES FISH AND WILDLIFE SERVICE, an agency of the U.S. Department of Interior, )<br><br>        Defendants. ) | Case No.:<br><br>**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** |

## INTRODUCTION

1.      This is a civil action for judicial review under the Administrative Procedure Act and the citizen suit provision of the Endangered Species Act of the U.S. Forest Service's Decision Notice and Finding of No Significant Impact ("DN") approving the East Boulder Fuels Reduction Project ("East Boulder Project") on the Gallatin National Forest and the Record of Decision ("ROD") approving the Bozeman Municipal Watershed Fuels Reduction Project ("Bozeman Project") on the Gallatin National Forest.  Plaintiffs Alliance for the Wild Rockies and Native Ecosystems Council attest that the final decisions approving the Projects are arbitrary and capricious, an abuse of discretion, and/or otherwise not in accordance with law.

2.      Among other things, the DN for the East Boulder Project authorizes 650 acres of commercial logging and thinning, 2.1 miles of temporary road construction, and ½ mile of road maintenance.

3.      The ROD for the Bozeman Project authorizes 1,575 acres of burning, 1,100 acres of mechanical cutting, 2,060 acres of partial logging (including 37% ground based, 24% skyline, and 39% helicopter) over a 5-12 year timeframe.  It also authorizes 200 acres of helicopter logging and 1,329 acres of prescribed burning in the Gallatin Fringe Inventoried Roadless Area.  The Project will require between 7.1 - 8.2 miles of new road construction and 3.1 - 4.2 miles of existing road

reopened for a total of up to 12.4 miles of additional open road in the Project area.

4.      Defendants' approval of the Projects violates the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4331 *et seq*., and NEPA regulations, the National Forest Management Act ("NFMA") 16 U.S.C. § 1600 *et seq*., and NFMA regulations, the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq*., and ESA regulations, the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq*, and APA regulations, and the Forest Service's Roadless Area Conservation Rule, 36 C.F.R. §§ 294.10–.14 (2004).

5.      Plaintiffs seek declaratory and injunctive relief to protect Plaintiffs' interests at law, including its interests that the Forest Service comply with NEPA's mandate to consider and disclose environmental impacts, comply with NFMA's mandate to protect biodiversity, and comply with the ESA's mandate to conduct consultation, mitigate harm, and prevent irreparable injury to the environment.

6.      Plaintiffs request that the approval of the Projects be set aside pursuant to 5 U.S.C. §706(2)(A) and 16 U.S.C. §1540(g), and that the Court enjoin the Forest Service from implementing the Projects until Defendants comply fully with NEPA, NFMA, the ESA, the APA, and the Roadless Rule.

7.      Plaintiffs seek a declaratory judgment, injunctive relief, the award of costs of suit, including attorney and any expert witness fees pursuant to the Equal Access to Justice Act and the ESA, and such other relief as this Court deems just and proper.

## **JURISDICTION**

8.     This action arises under the laws of the United States and involves the United States as a defendant.  Therefore, this Court has subject matter jurisdiction over the claims specified in this Complaint pursuant to 28 U.S.C. §§ 1331, 1346.

9.     An actual controversy exists between Plaintiffs and Defendants.  Plaintiffs' members use and enjoy the Gallatin National Forest, including the Project area, for hiking, fishing, hunting, camping, photography, and engaging in other vocational, scientific, spiritual, and recreational activities.

10.     Plaintiffs' members intend to continue to use and enjoy the East Boulder Project area frequently and on an ongoing basis in the future.  Specifically, Michael Garrity, a member and Executive Director of Plaintiff AWR, has plans and a firm intention to visit the Project area in 2012 and on an ongoing basis into the future.

11.     Plaintiffs' members intend to continue to use and enjoy the Bozeman Project area frequently and on an ongoing basis in the future.  Specifically, Steve Kelly, a member of Plaintiff Alliance for the Wild Rockies, has plans and a firm intention to visit the Project area throughout 2012 and on an ongoing basis in following years.

12.     The aesthetic, recreational, scientific, spiritual, and educational interests of Plaintiffs' members have been and will be adversely affected and irreparably

injured if Defendants implement the Projects.  These are actual and concrete injuries caused by Defendants' failure to comply with mandatory duties under NEPA, NFMA, the ESA, the APA, and the Roadless Rule.  The requested relief would redress these injuries and this Court has the authority to grant Plaintiffs' requested relief under 28 U.S.C. §§ 2201, 2202, and 5 U.S.C. §§ 705, 706, and 16 U.S.C. § 1540(g).

13.     Plaintiffs submitted extensive written comments and appeals concerning the Projects, have fully participated in the administrative review process, and thus have exhausted administrative remedies as required for the APA claims.

14.     Plaintiffs have also filed 60 day notices of intent to sue under the Endangered Species Act concerning the Projects, which have expired, and thus have exhausted statutory requirements as required for the ESA claims.

15.     The Forest Service has declared that the appeal decision for the East Boulder Project was the final administrative action of the U.S. Department of Agriculture Forest Service.  The Project was effective upon the October 6, 2011 appeal denial by Forest Supervisor, Mary Erickson, and is therefore final and subject to this Court's review.

16.     The Forest Service has declared that the Regional Forester's appeal decision for the Bozeman Project was the final administrative action of the U.S. Department of Agriculture Forest Service.  The Project was effective upon the March 05, 2012

appeal denial by Deputy Regional Forester Jane L. Cottrell and is therefore final and subject to this Court's review.

## VENUE

17.     Venue in this case is proper under 28 U.S.C. § 1391(e) and LR 3.3(a)(1). Defendant Christiansen, U.S. Forest Service Region One Interim Forester, is the chief representative in Montana for the U.S. Forest Service.  Her office is located within the Missoula Division of the United States District Court for the District of Montana. Additionally, Deputy Regional Forester Cottrell signed the appeal denial affirming the Bozeman Project, and her office is also located within the Missoula Division of the United States District Court for the District of Montana.

## PARTIES

18.     Plaintiff Alliance for the Wild Rockies ("AWR") is a Montana based tax-exempt, nonprofit organization dedicated to the protection and preservation of the native biodiversity of the Northern Rockies Bioregion, its native plant, fish, and animal life, and its naturally functioning ecosystems.  AWR has over 2,500 members, including members who reside on private land close to the Gallatin National Forest, and many members who recreate in the Project areas.  AWR's registered office is located in Helena, Montana.  AWR brings this action on its own behalf and on behalf of its adversely affected members.

19.     Plaintiff Native Ecosystems Council ("NEC") is a non-profit Montana

corporation with its principal place of business in Three Forks, Montana.  NEC is dedicated to the conservation of natural resources on public lands in the Northern Rockies.  Its members use and will continue to use the Gallatin National Forest for work and outdoor recreation of all kinds, including fishing, hunting, hiking, horseback riding, wildlife viewing, and cross-country skiing.  The Forest Service's unlawful actions adversely affect NEC's organizational interests, as well as its members' use and enjoyment of the Gallatin National Forest, in the Project areas. NEC brings this action on its own behalf and on behalf of its adversely affected members.

20.    Defendant Vicki Christensen is the Interim Regional Forester for the Northern Region of the U.S. Forest Service, and in that capacity is the official representative of the U.S. Forest Service's Northern Region.  She has the ultimate responsibility for ensuring that decisions made at the National Forest (unit) level in the Northern Region are consistent with applicable laws, regulations, and official policies and procedures.

21.    Defendant United States Forest Service ("Forest Service") is an administrative agency within the United States Department of Agriculture, entrusted with the management of our National Forests.

22.    Defendant United States Fish and Wildlife Service ("USFWS") is an administrative agency within the United States Department of Interior, entrusted

with administering the ESA with respect to terrestrial wildlife such as the Canada

lynx and the grizzly bear.

## PROCEDURAL BACKGROUND

### I. East Boulder Project

23.     On or about March 16, 2010, the Forest Service released the original East

Boulder Fuels Reduction EA to the public and began the 30-day comment period

on the Project.

24.     On or about March 24, 2010 and April 13, 2010, Plaintiffs issued timely

public comments on the original EA.

25.     On or about June 4, 2010, District Ranger Avey signed the DN and FONSI

authorizing the Project.

26.     On or about July 19, 2010, Plaintiffs filed timely appeals on the decision.

27.     On or about August 27, 2010, District Ranger Archuleta withdrew the

decision to "re-evaluate the wildlife analysis for the project."

28.     On or about April 25, 2011, District Ranger Archuleta posted legal notice of

a Revised EA ("REA") for the Project beginning another 30-day comment period.

29.     On or about May 24, 2011, Plaintiffs submitted timely public comments on

the REA.

30.     On or about July 29, 2011, Acting District Ranger Oswald posted legal

notice of the 2011 DN and FONSI beginning the 45 day appeal period.

31.     On or about September 12, 2011 Plaintiffs submitted timely appeals on the DN.

32.     On or about October 6, 2011, after reviewing and denying Plaintiffs' appeals, Supervisor Erickson signed the appeal denial authorizing Project implementation.

33.     In 2010, Plaintiffs sent a 60 day notice of intent to sue under the Endangered Species Act to Defendants.

34.     On September 23, 2011, Plaintiffs sent a supplemental 60 day notice of intent to sue under the Endangered Species Act to Defendants.

**II. Bozeman Project**

35.     The Forest Service published legal notice of the opportunity to comment on the Draft Environmental Impact Statement ("DEIS") for the Bozeman Project on October 22, 2007.

36.     On or about October 29, 2007, Plaintiffs issued timely comments on the DEIS.

37.     On or about March 26, 2010, the Forest Service published legal notice of the Final Environmental Impact Statement ("FEIS") and Record of Decision ("ROD").

38.     On or about May 11, 2010, Plaintiffs issued a timely appeal on the FEIS.

39.     On or about February 21, 2011, the Forest Service released a Supplemental FEIS ("SFEIS") and ROD.

40.     On or about April 07, 2011, Plaintiffs issued a timely appeal on the SFEIS and ROD.

41.     In May 2011, Forest Supervisor Erickson withdrew the February 2011 ROD to allow for a more formal public review of the SFEIS.

42.     On or about November 29, 2011, the Forest Service issued a revised SFEIS ("Final SFEIS or FSFEIS") and ROD and posted notice of the FSFEIS in December 2011.

43.     On or about January 16, 2012, Plaintiffs issued timely appeals on the November 2011 FSFEIS and ROD.

44.     On or about March 05, 2012, after reviewing and denying Plaintiffs' appeals, Regional Forester Cottrell signed the appeal denial authorizing Project implementation.

45.     On or about April 27, 2011, Plaintiffs issued a 60 day notice of intent to sue under the ESA.

46.     On or about January 21, 2012, Plaintiffs issued a second 60 day notice of intent to sue under the ESA.

## FACTUAL ALLEGATIONS

### I.   Description of the Gallatin National Forest

47.     The Forest provides habitat for a range of unique and sensitive wildlife species including wolverines, flammulated owls, moose, elk, marten, black-backed

woodpeckers, and goshawks.  It also provides habitat for species listed under the

Endangered Species Act including the grizzly bear, gray wolves, and the Canada

lynx.

48.     Wildfire, including stand-replacing fire, is an important natural process in

the Forest.

49.     Stand replacing fires that burned over large areas were distributed patchily

and occurred on intervals of 100 to 300 years, allowing sufficient time for recovery

of processes such as soil and nutrient cycles.

50.     The Forest Service has reduced the size and intensity of fires through

suppression of emerging fires.  In the Project areas, suppression of emerging fires

has been ongoing for nearly a century.

51.     Fire suppression and logging have changed the vegetative character of the

Forest including plant community biomass production, species composition, and

diversity.

52.     In this area, it takes about 60 to 70 years to produce mature forest structure

after a major disturbance.

53.     Habitat alterations resulting from the Projects' actions could affect forest

carnivore use of the Project areas for decades.

54.     The Canada lynx is an ESA-listed threatened species that occurs on the

Forest.  It is associated with mature to late-successional forests with dense multi-

layered understories, and is heavily reliant upon a prey base of snowshoe hare.

55.    On March 23, 2007, the Northern Rockies Lynx Management Direction ("NRLMD") Record of Decision ("ROD") was signed, and the provisions of the NRLMD were adopted in Forest Plans as management direction for mapped and occupied lynx habitat on National Forest System lands.

56.    The USFWS issued a biological opinion on the effects of the NRLMD on the Distinct Population Segment of Canada lynx in the contiguous United States. This biological opinion was deemed a first-tier consultation, with review of subsequent projects constituting second tier consultations.

57.    Second tier biological opinions would be necessary for adverse effects not addressed under the first tier biological opinion.

58.    The NRLMD first-tier biological opinion analyzed, among other things, exceptions for fuel and timber management projects in Wildland Urban Interfaces ("WUI") and provided an incidental take statement ("ITS") for projects implementing these exceptions and exemptions.

59.    The NRLMD first-tier biological opinion relied upon the USFWS's 2006 lynx critical habitat rule, a rule that had only designated 1,841 acres of critical lynx habitat, none of which was on National Forest land.

60.    The most current lynx critical habitat rule, released in 2009 and after the NRLMD, designated roughly 39,000 acres of lynx critical habitat, much of which

is found on National Forest lands.

61.     As a result of litigation in *Alliance for the Wild Rockies v. Lyder*, 728 F.Supp.2d 1126 (D. Mont. 2010, the 2009 rule was deemed to be in violation of the ESA, and was remanded to the USFWS by court order for further consideration of additional critical habitat designation, but it is still legally in place until a new rule is approved, which will likely be many years from now.

62.     The NRLMD has never been analyzed to determine its impact on lynx critical habitat on National Forest lands because the biological opinion was completed before any lynx critical habitat was designated on National Forest lands.

63.     The grizzly bear is an ESA-listed threatened species that inhabits the Forest and is associated with low road densities.

64.     With historic populations estimated at 50,000 – 100,000 across the lower 48 states, grizzlies were rapidly exterminated during and following westward expansion to less than 1,000 bears in mountainous areas of Washington, Idaho, Montana, and Wyoming.

65.     Today, the grizzly bear occupies less than two percent of its former range south of Canada with only five areas supporting remnant or self-perpetuating populations.

66.     One of the surviving populations is in the Greater Yellowstone Area ("GYA"), which covers parts of Montana, Idaho, and Wyoming.

67.     Grizzly bears are particularly vulnerable to human presence and persecution; they are easy to kill and they are one of the slowest mammals in North America to reproduce.  The USFWS has stated, "at best [a female] grizzly can replace herself with one breeding age female in the first decade of her life."

68.     Grizzly cubs stay with their mother for two to three years, learning about finding food and surviving in the wild, before dispersing to establish their own home ranges.

69.     Grizzlies have extremely large home ranges of hundreds of square miles and are known to travel over 60 miles at a time.

70.     Roads are the leading cause of grizzly mortalities.  The USFWS notes that "[r]oads probably pose the most imminent threat to grizzly habitat today."

71.     The grizzly bear was listed as a threatened species under the ESA in 1975, in large part because the grizzly had been forced into vulnerable, isolated populations and because the increase in logging access roads allowed humans into formerly inaccessible bear habitat resulting in increased grizzly mortality.

72.     In 1982, the USFWS approved a Grizzly Bear Recovery Plan and revised the plan in 1993.

73.     The 1993 Recovery Plan established four recovery zones, including the GYA ecosystem.

74.     In 2007, a final rule designated the GYA grizzly bear as a distinct population

segment and removed them from ESA listing.

75.    In 2009, a court order vacated that delisting and remanded the decision back to the Service.  The 2009 decision vacating the delisting was upheld by the 9th Circuit in November of 2011.  Thus, the GYA grizzly bear is currently listed as a threatened species under the ESA.

76.    Grizzly bears frequently use and occupy areas outside of the formally designated Yellowstone Grizzly Bear Recovery Zone ("recovery zone").  Twenty percent of this occupied habitat is within areas of light motorized use, and another 37% is within areas of moderate to high motorized use.

77.    The only USFWS Biological Opinion currently in effect and pertaining to grizzly bear management forest-wide across the Gallatin National Forest and outside of the recovery zone is the 2006 Gallatin National Forest Travel Management Plan Biological Opinion.

78.    The 2006 Travel Plan Biological Opinion admits that take of grizzly bears is most likely to occur outside of the recovery zone.  However, it does not set specific road density standards for these areas and instead uses secure habitat as a surrogate measure of take for bears outside of the recovery zone.

79.    The USFWS relies on the interagency Grizzly Bear Conservation Strategy ("conservation strategy"), rather than the Interagency Grizzly Bear Committee ("IGBC") guidelines, in concluding that only secure habitat need be monitored in

areas outside of the recovery zone.

80.   The conservation strategy itself states that "[t]his Conservation Strategy was developed to be the document guiding management and monitoring of the Yellowstone grizzly bear population and its habitat *upon* recovery and *delisting*." (emphasis added).

81.   The conservation strategy for delisted bears was intended to replace "management using a recovery zone line and grizzly bear Management Situations described in the Interagency Grizzly Bear Guidelines (IGBC 1986)" for ESA listed bears.

82.   Accordingly, the "secure habitat" standards in the conservation strategy provide management thresholds for Yellowstone grizzly bears if and when they are delisted, and does not currently apply to Yellowstone grizzly bears because they are currently still listed under the ESA and thus still protected by the IGBC management direction.

83.   Secure habitat is defined in the Travel Plan Biological Opinion as areas more than 500 meters from an open or gated motorized access route or re-occuring helicopter flight line from March 1st through November 30th.  Secure habitat must be greater than or equal to 10 acres in size, excluding large lakes.

84.   The 2006 Travel Plan calls for 57% secure habitat in the Gallatin / Madison area outside of the recovery zone and 78.9% secure habitat in the Absaroka /

Beartooth area outside of the recovery zone.   These percentages are based upon a 1998 habitat baseline.

85.    The Bozeman Project is located in the Gallatin / Madison area outside of the recovery zone.

86.    The East Boulder Project is located in the Absaroka / Beartooth area outside of the recovery zone.

87.    The Incidental Take Statement (ITS) Terms and Conditions for the 2006 Travel Plan requires the Forest Service to follow access management direction within the proposed action, including standards related to secure habitat.

88.     The 2006 Travel Plan ITS further requires the Forest Service to monitor the amount of secure habitat in the action area outside of the recovery zone and report any changes. The Forest Service must complete these reports annually, in January of each year, and submit them to the USFWS.

89.    Only five terrestrial species are identified as Management Indicator Species ("MIS") on the Gallatin National Forest.  Two species, the American pine marten and the Northern goshawk, are designated as MIS for old growth dependent species on the Forest.

90.    The American pine marten is a MIS for moist spruce old growth on the Forest.

91.    Stumps and downed logs are important habitat features for this species.

92.    Logging degrades marten habitat.

93.    Goshawks are associated with mature and old growth forest and are a MIS for the Forest.

94.    The Forest Service does not have population trend data for goshawks on the Forest.

95.    Several sensitive species dependent upon snag habitat and old growth have potential habitat on the Forest and in the Project areas.

96.    The Forest Plan requires the Forest Service to manage sensitive species habitat to maintain the species.

97.    The Forest Plan has a snag objective of 30 snags per 10 acres on the Forest.


**II. Description of the East Boulder Project Area**

98.    The East Boulder Project area is located in the Gallatin National Forest ("Forest") in the Absaroka Mountain Range of Montana, lying adjacent to the North Absaroka Inventoried Roadless Area.

99.    The East Boulder Project area is located in the East Boulder River corridor and covers 4,000 acres.

100.   The East Boulder Project area supports spruce and aspen in the canyon bottoms that give way to Douglas-fir, lodgepole pine, and a mix of Englemann spruce, subalpine fir, big sagebrush, and other shrub-steppe, meadows, and riparian

complexes.  Elevations in the Project area range from 5,700 feet to 7,800 feet, and topography transitions from rolling hills to steep mountain terrain with saddles and ridges.

101.   The East Boulder Project area has been heavily roaded, logged, and cleared.

102.   Project logging will reduce canopy cover in treatment units from and existing level of 70-90% down to 40-60%.

103.   The Forest Plan snag objective of 30 snags per 10 acres is not being met in the Project area.

104.   Of the 89 10-acre plots surveyed in the Project area, 70 plots have no snags available at all, 13 plots have only one snag available, and the remaining 6 plots have only 2 or 3 snags available per plot.

105.   The Forest Service admits that Project activities will further reduce the number of existing snags, will decrease the supply of live replacement trees, and will increase visibility of the few remaining snags making them more vulnerable to firewood cutters.

106.   The Project area is overlapped by old growth timber compartments 112, 113, 114, and 115.

107.   Past logging activities have contributed to timber compartment 113 falling below the Gallatin Forest Plan 10% old growth management standard. Timber Compartment 113 currently has only 8% old growth.

108.   While the Forest Service argues that no old growth will be logged in Timber Compartment 113, Project Maps #6 and #7 indicate that a patch of old growth will be logged within treatment unit 18, which is within Timber Compartment 113.

109.   Project activities would reduce available snags, downed woody debris, and overhead cover for the MIS marten.

110.   Based upon habitat modeling, the Forest Service speculates that there are 2,515 acres of preferred and suitable marten habitat in the direct/ indirect effects analysis area and approximately 4,180 acres in the cumulative effects analysis area.

111.   Trapping records indicate that marten are rare or nonexistent in the Project area.

112.   The Forest Service has not monitored the American marten in the Project area.

113.   There are no confirmed American marten occurrences in the Project area.

114.   Northern goshawks are a MIS for the Forest.

115.   Based on modeling data, primarily habitat modeling from Samson (2006), the Forest Service speculates that there is more than enough suitable nesting habitat available for goshawks both on the Forest and in the Project area.

116.   Project records indicate the Forest Service has conducted multiple surveys for goshawks in the area between 1996 and 2011.  It appears from Project records that only 4 detections (three individuals and one pair) were documented between

1996 and 2011.  No nests were found over this 15 year period.

117.   The Forest Service has failed to detect a single nesting goshawk in the Project area.

118.   The Forest Service conducted surveys for flammulated owls, a cavity nesting and snag dependent sensitive species, near the analysis area in 2001, 2003, and 2005, but no owls were found.  No surveys were conducted in the Project area.

119.   The Forest Service does not have species records for the flammulated owl.

120.   The Forest Service has not monitored for long-eared and long-legged myotis, snag dependent sensitive species, and notes that Project activities would remove roost sites.

121.   The Forest Service has failed to monitor and failed to discuss Project impacts to the black backed woodpecker, a cavity nesting sensitive species, stating only that sufficient snag habitat is not available in the Project area.

122.   The Project will occur in Unit 5, Greater Yellowstone Area, which is designated as critical habitat for lynx.

123.   The Project is also within the East Boulder Lynx Analysis Unit ("LAU"), which covers an area of approximately 87,789 acres at the North end of the Beartooth Mountain Range.

124.   The Forest Service and the USFWS determined that the adverse effects of the East Boulder Project would fall within the scope of effects analyzed under the

2007 first tier biological opinion for the NRLMD and would conform to the 2007 ITS for the NRLMD.

125.   Neither agency addressed the fact that the 2007 first tier biological opinion for the NRLMD completely failed to analyze impacts of the NRLMD on lynx critical habitat on Gallatin National Forest lands.

126.   Currently, only 5.4% of Forest Region One is lynx habitat.  Historically, 19% of Region One would have been available to lynx as habitat.

127.   The Forest Service estimates that 33% of the East Boulder LAU currently provides foraging habitat.

128.   Perpetual clearings for roads and power lines, recent burns, and recent clearcuts have degraded previously suitable lynx habitat rendering it now unsuitable for lynx.

129.   One hundred ninety (190) acres of the LAU are permanently cleared of habitat essentials to facilitate mining operations and are "considered a permanent habitat loss for lynx."

130.   Project logging and burning units would be mostly contiguous and cover considerable acreage, so "substantial amounts of cover could be removed for lynx and their prey species" in addition to acreages already rendered unsuitable.

131.   Project activities would degrade an additional 213 acres of suitable snowshoe hare habitat, 142 acres of denning habitat, and 280 acres of matrix

habitat within the East Boulder LAU.

132.   The threatened GYA grizzly bear is found in the Project area.

133.   The Project area is outside of the GYA recovery zone but is in an area considered suitable habitat for and occupied by grizzly bears.

134.   At least one grizzly bear has been recently spotted within the Project area and others have recently been spotted near the Project area.

135.   The Forest Service states that "[t]here are no standards specific to management for grizzly bears in the management areas associated with this project."

136.   The Forest Service does not address compliance with the 2006 Travel Plan standard requiring 78.9% secure habitat in the Absaroka / Beartooth area, the area in which the East Boulder Project occurs.

137.   The Forest Service does not explain how the IGBC management direction for ESA-listed grizzly bears applies to the Project area.

138.   The Project area contains important winter range for mule deer and moose.

139.   The Project area is subject to heavy snowfall and frequent high wind events and thus an increased risk of snow crusting, a condition that makes travel over the snow surface particularly difficult for big game.

140.   Winter range, an essential habitat condition for big game, provides canopy cover that intercepts snow, blocks wind, and reduces snow crusting, making

movement for big game less difficult and energy consuming.

141.   Thermal cover is identified as a "key habitat component" for big game in the Forest Plan and must be mapped on a site-by-site basis during project area analysis.

142.   Thermal cover is defined in the Forest Plan as cover used by animals to ameliorate chilling effects of weather.

143.   Thermal cover is an essential habitat component to lessen effects of ambient temperature on big game species, thus reducing the amount of energy expenditure required for thermoregulation.

144.   For elk, a stand of coniferous trees 40 feet or taller with an average crown closure of 70% or more will offer thermal cover; for deer, coniferous forest stands of at least 5 feet tall with a 60-75% crown closure will offer thermal cover.

145.   Project activities will reduce mapped mule deer winter range units (units 1, 3, and 5) from 70-90% Douglas-fir canopy cover to 40-60%, and activities will reduce lodgepole pine canopy cover in these units from 70-90% to 40-50%.

146.   Project activities will reduce mapped moose winter range units from 70-90% canopy cover to 35-45% Douglas-fir canopy cover and 20-40% lodgepole pine canopy cover.

147.   Project activities will destroy little alpine fir, an important forage source for moose.

148.   Of the 646 acres slated for logging, 539 acres are mapped or unmapped (but discussed and mitigated as) big game winter range.

149.   Commercial logging will affect 403 acres of big game winter range, and hand-thinning will affect 136 acres of big game winter range.

150.   The Forest Service admits that project activities will decrease winter thermal cover in an area that is particularly "important winter range for mule deer."

151.   The area saw at least a 19% decrease in mule deer population, a 34.5% decrease in mule deer recruitment, and a 47% reduction in buck harvest for the 2008 hunting season.

152.   Further, mule deer population numbers were down from a long-term of average of 377 to about 310 in 2010.

153.   The East Boulder Project will include 490 acres of tractor logging, 20 acres of skyline cable logging, 140 acres of hand treatment, 2.1 miles of temporary road construction, and 0.5 miles of existing road maintenance over a 5 year period. Both large and small diameter trees will be logged.

154.   In general, logging and burning will reduce the existing canopy cover from 70-90% to 40-60% and would increase forest openings substantially.

155.   The logging authorized by the East Boulder Project will eliminate over 259 acres of preferred and suitable pine marten foraging and denning habitat through reductions in available snags, downed woody debris, and overhead cover.

156.   The logging authorized by the Project will eliminate over 104 acres (4%) of potential goshawk nesting habitat that would not be regained for at least 60-70 years.

157.   The logging authorized by the Project will render potential habitat for the flammulated owl, the long-eared and long-legged myotis, and the black-backed woodpecker unsuitable.

158.   The logging authorized by the Project will render over 350 acres of critical lynx habitat unsuitable.

159.   The logging and road building authorized by the Project will degrade grizzly habitat and displace grizzly bears from the Project area throughout the implementation of the Project.

160.   The Forest Service did not provide population trends of its MIS in the EA for the Project.

161.   The Forest Service does not know the baseline populations for its MIS.

162.   The Forest Service does not know the current populations for its MIS.

163.   The Forest Service admits that Project activities will reduce available cover in the Project area and may have negative effects on wintering deer in the area such as altering movement patterns and increasing vulnerability to predation, weather, and hunting.

164.   The Forest Service admits that stormwater runoff from logging roads that is

channeled through culverts and ditches in the Project area may require NPDES permits.

165.   Montana DEQ is prepared to work with the Forest Service on NPDES permitting for point sources on Forest Service roads.

166.   Despite Montana DEQ's readiness to work with the Forest Service, the Forest Service has failed to seek comments and/or consult with Montana Department of Environmental Quality ("DEQ") regarding the necessity of and/or appropriate procedure for applying for and obtaining NPDES permits for the East Boulder Project area.

**III.    Description of the Bozeman Project**

167.   The Bozeman Project is located in the 50,000 acre Bozeman Municipal Watershed in the Gallatin National Forest, which includes the Bozeman Creek drainage and the Hyalite Creek drainage and includes portions of the Gallatin Fringe Inventoried Roadless area.

168.   The Bozeman Project will implement 1,575 acres of burning, 1,100 acres of mechanical cutting, 2,060 acres of partial logging (including 37% ground based, 24% skyline, and 39% helicopter) over a 5 to 12 year timeframe.

169.   Two hundred acres of the helicopter logging and 1,329 acres of prescribed burning will occur within the Gallatin Fringe Inventoried Roadless Area ("IRA").

170.   Subject to very limited exception, the Roadless Rule prohibits road

construction, reconstruction, and logging in IRAs because these activities have the greatest likelihood of altering and fragmenting landscapes.

171.   Logging and burning activities for the Project call for about 30-50% removal of forest biomass in treatment units.

172.   The Project will require between 7.1 - 8.2 miles of new road construction and 3.1 - 4.2 miles of existing road reopened, including the permanently closed Road 454, for a total of up to 12.4 miles of additional open road in the Project area.

173.   Open road density would increase from 1.28 mi/mi2 to 1.66 mi/mi2 in the Project area. Including motorized use on single track trails, the total motorized access route density in the Project area would become 1.75 mi/mi2.

174.   The Project is located within designated critical habitat for the Canada Lynx.

175.   The Project is also located within the North Gallatin Lynx Analysis Unit.

176.   The North Gallatin LAU covers an area of about 103,334 acres at the north end of the Gallatin Range, on the west side of the Gallatin Crest.

177.   Roughly 66% of the LAU (67,910 acres) provides lynx habitat with about 33,103 acres (49%) providing denning habitat and 5,249 acres (8%) providing young, densely stocked conifer regeneration foraging habitat.

178.   Roughly 6,652 acres (10%) of the lynx habitat within this LAU is currently in an unsuitable condition, primarily due to past timber harvest actions that have removed all or most of the cover from an affected area.

179.   The Project would further impact about 2,673 acres of lynx habitat. Burning and logging would bring the total unsuitable lynx habitat within the Project area to 1,164 acres (8% of lynx habitat within the project area) and would increase unsuitable habitat in the LAU to 11%.

180.   Lynx denning habitat would be reduced by 1,133 acres.

181.   At least 296 acres of early succession lynx foraging habitat will be rendered unsuitable with additional foraging habitat in mature stands also destroyed.

182.   Snowshoe hare forage would be reduced through the removal of the horizontal structure of natural forest succession phases and through altering the mosaics of the forested landscape.

183.   The Project will impact lynx habitat connectivity within the North Gallatin LAU by concentrating treatment in multiple contiguous large units in the project area.

184.   Ridgeline fuelbreak prescriptions are scattered throughout the Project area, affecting a total of approximately 8.3 miles of forested ridgeline.

185.   Prescriptions for ridgeline fuelbreaks call for at least 70% of the woody vegetation and overstory canopy to be removed in 100 to 200 foot bands along the ridgelines, leaving 60-70 foot spaces between tree trunks.

186.   Lynx habitat standards and guidelines under the NRLMD direct the Forest Service to avoid constructing permanent firebreaks on ridges because these are

particularly important areas for lynx.

187.   The activities will be conducted under exceptions to Standards VEG S5 and S6 of the NRLMD for treatments in the WUI.

188.   Project effects to lynx were evaluated relative to project compliance with direction contained in the NRLMD and the NRLMD ITS.

189.   The Project will have adverse impacts to lynx critical habitat.

190.   The "no adverse modification of lynx critical habitat" determination was based upon Project compliance with the NRLMD ITS.

191.   Neither agency addressed the fact that the NRLMD ITS/BIOP completely failed to analyze impacts of the NRLMD on lynx critical habitat on Gallatin National Forest lands.

192.   The Project area provides potential spring and summer grizzly bear habitat in lower elevation riparian communities.

193.   Low-elevation riparian habitats are of significant seasonal importance to grizzly bears.  Grizzly bears typically use the lowest elevations possible for foraging during spring.

194.   Grizzly bear use has been documented within the analysis area.

195.   The Project is located outside of the recovery zone but within the distribution area for grizzly bears.

196.   Grizzly bears are particularly sensitive to disturbance effects from roads.

197.   Pursuant to the Grizzly Bear Management Plan for Southwestern Montana 2002-2012, the State of Montana has a goal to maintain road densities of one mile or less per square mile of habitat.

198.   IGBC direction also finds that open road densities over one mile per square mile degrade grizzly bear habitat.

199.   Accordingly, for example, the Kootenai National Forest Plan sets a linear road density threshold of 0.75 for roads in grizzly bear habitat, and finds that densities above that threshold cause take under the ESA.

200.   The Project area already has a high total and open motorized route density of 1.36 mi/mi2 and 1.28 mi/mi2 respectively and would be driven even higher with Project activities.

201.   The Forest Service and the USFWS explain that effects of Project roads were not analyzed because the effects of roads and road use were analyzed under the 2006 Gallatin National Forest Travel Management Plan biological opinion.

202.   The 2006 Travel Plan calls for 57% secure habitat in the Gallatin / Madison area outside of the recovery zone.   The Bozeman Project is located in the Gallatin / Madison area.

203.   The Forest Service failed to address compliance with security habitat standards from the Travel Plan biological opinion in the Bozeman Project record.

204.   In addition to the effects of roads and the loss of secure habitat, the Project

would reduce the availability of grizzly bear cover in the project area from 84% to 66%, resulting in a significant loss of hiding and thermal cover for grizzly bears.

205.   Waller (1992) found that grizzly bears avoid stands where the vegetation had not recovered enough to provide security cover and preferred to use stands that were 30 to 40 years post-harvest.

206.   Other Project disturbance factors include increased human presence in the Project area, noise from equipment used for road construction, timber felling and hauling, and slashing and burning.

207.   Additionally, helicopter logging, requiring repeated, low elevation flights (less than 500 meters) and landings over an extended period of time, will occur in IRAs occupied by and critical to grizzly bears.

208.   Schwartz et al. (2010) notes that the most important predictors of survival for grizzly bears are the amount of secure habitat within a bear's home range and road densities outside of secure habitat.

209.   Roadless areas have the same general characteristics as "core" habitat identified within the grizzly bear recovery zone and provide secure areas for bears to be relatively free from the chronic disturbances associated with roads.  Grizzly bears are less likely to expect human-created disturbance in these areas and will be particularly sensitive to helicopter presence, logging, and burning.

210.   Helicopter logging using low elevation flight paths would reduce secure

habitat in the area.

211.    In the biological opinion for the Project, the USFWS found that helicopter logging may result in adverse effects causing take of grizzly bears, and this take would not be covered by the 2006 Travel Plan ITS that measures secure habitat.

212.    The USFWS notes that take related to helicopter use is likely tied to increases in road densities and explains that because the Bozeman Project will result in temporary increases in road densities, such helicopter logging in this case may contribute to the disturbance and increase the potential for incidental take caused by these temporary access management changes.

213.    For impacts caused by helicopter use, the USFWS used a surrogate take measure, the duration of helicopter logging, to form the parameters of its ITS because the USFWS was unable to quantify the numbers of grizzly bears that would be incidentally taken as a result of the Project.

214.    The USFWS anticipates that helicopter logging will result in take of a "few" female grizzly bears, yet the take exemption appears to be measured strictly by duration of helicopter logging.

215.    The USFWS notes that "[i]f the helicopter logging takes longer than the number of days described in our surrogate measure above, then the level of incidental take we anticipated in this biological opinion would be exceeded and therefore the level of take exempted would be exceeded."

216.   Thus, the ITS appears to exempt take of an unlimited number of grizzlies for up to 144 days during the non-denning season and over a period of five concurrent years, irrespective of any amount of road density change.

217.   The Agencies admit that the Project will cause take for at least a few years after the Project is complete.

218.   Disturbance effects are often of long duration because grizzly cubs learn habitat utilization from their mother.  Learned avoidance behavior may persist for more than one generation of grizzly bears before grizzly bears again utilize habitat associated with closed roads. Thus, displacement from preferred habitats may significantly modify normal grizzly bear behavioral patterns.

219.   The Northern goshawk, a MIS, has habitat in the Project area.

220.   The Forest Service states that the Project area contains suitable goshawk nesting habitat and historic goshawk nest locations are known within the Hyalite drainage.

221.   The Project would have direct adverse impacts on 1,026 acres of currently suitable goshawk nesting habitat, rendering these acres unsuitable.

222.   Thinning and burning prescriptions for the Bozeman Project call for about 30-50% removal of forest biomass in treatment units.

223.   Project activities would reduce available nesting habitat within the area and alter forest structure within suitable goshawk home ranges.

224.   The Forest Service conducted field surveys for goshawks from 2004 through 2007.  Only one active goshawk nest was found in the Project vicinity.

225.   The Forest Service does not have population trend data on the Northern goshawk.

226.   The American Pine Marten, a MIS, has habitat in the Project area.

227.   The Project area is used for foraging by reproductive female martens whose den sites may be within or near the project area.

228.   The Project would impact 3,888 acres of security cover for marten, which will impact foraging, movement, and dispersal behavior.  Security cover will be reduced from 84% to 66%.

229.   Of the total acres of security cover affected, mechanical thinning would alter 18 acres of primary marten habitat and 381 acres of secondary marten habitat, which could influence marten reproductive capability in the project area.

230.   The Forest Service states that marten and other forest carnivore surveys were conducted in the Project vicinity each winter between 1999 and 2005. These surveys consisted of snow tracking, remote camera stations, and/or hair snares.

231.   While the Forest Service states that marten tracks were found during the surveys, survey results were not discussed or extrapolated.

232.   The Forest Service also notes that "Montana Fish, Wildlife and Parks personnel (Anderson, pers. comm.) were contacted for information regarding MIS

(e.g. marten) population trends." While the communication notes state that population trends for the marten are generally stable for the Forest, there is no discussion regarding the basis for this conclusion.

233.   The Forest Service admits that Project activities will render various acreages of threatened Canada lynx critical habitat unsuitable.

234.   The Forest Service admits that Project activities will render various acreages of important grizzly bear habitat unsuitable and will likely displace grizzlies from the area.

235.   The Forest Service does not have or disclose population trend data for its management indicator species.

236.   The Forest Service admits that Project activities will render various acreages of Northern goshawk and American pine marten habitat unsuitable.

237.   The Forest Service admits that stormwater runoff from logging roads that is channeled through culverts and ditches in the Project area may require NPDES permits.

238.   Montana DEQ is prepared to work with the Forest Service on NPDES permitting for point sources on Forest Service roads.

239.   Despite Montana DEQ's readiness to work with the Forest Service, the Forest Service has failed to seek comments and/or consult with Montana Department of Environmental Quality ("DEQ") regarding the necessity of and/or

appropriate procedure for applying for and obtaining NPDES permits for the

Bozeman Project area.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
The 2007 NRLMD ROD, EIS, Biological Opinion and
Incidental Take Statement violate the ESA and NEPA.

240.   All above paragraphs are incorporated by reference.

241.   The NRLMD NEPA and ESA analysis, including the Biological Opinion

and Incidental Take Statement, analyze impacts upon lynx critical habitat based

upon the 2006 lynx critical habitat rule.  That rule had only designated 1,841 acres

of critical habitat for the lynx, none of which was on National Forest Land.  That

rule was superseded in 2009 by a rule that designates 39,000 acres of lynx critical

habitat, including areas on National Forest lands.

242.   Thus, the NRLMD NEPA and ESA analysis completely fail to analyze the

direct, indirect, and cumulative effects of the NRLMD management direction and

implementation on lynx critical habitat on Gallatin National Forest lands, and all

other National Forest lands.

243.   The Agencies did not make up for this failure by assessing the direct,

indirect, and cumulative effects of the NRLMD on lynx critical habitat on all

National Forest lands in the NEPA/ESA analysis for either challenged Project.

244.   The biological assessment and biological opinion/ITS for the NRLMD

violate the ESA because they are arbitrary and capricious and do not apply the best available scientific and commercial information, including the most recent lynx critical habitat rule.

245.   The agencies must reinitiate ESA consultation on the NRLMD to determine its impacts on lynx critical habitat on National Forest System lands.

246.   The NEPA analysis for the NRLMD violates NEPA because it does not take a hard look at impacts on lynx critical habitat on National Forest lands.

247.   The Forest Service must complete a supplemental NEPA analysis for the NRLMD in light of the significant change in circumstances that lynx critical habitat is now designated on National Forest lands.

## SECOND CLAIM FOR RELIEF
The Agencies' site-specific project determinations of no adverse modification to lynx critical habitat are arbitrary, capricious, and violate the ESA and NEPA.

248.   All above paragraphs are incorporated by reference.

249.   ESA Section 7 requires that for every federal action, the agencies ensure that the proposed action "will not result in the "destruction or adverse modification" of critical habitat.

250.   The purpose of establishing critical habitat is for the government to carve out territory that is not only necessary for the species survival but also essential for the species recovery.

251.   Agencies cannot mask localized impacts by focusing on a large scale

analysis; focusing solely on a vast scale can mask multiple site-specific impacts that, when aggregated, do pose a significant risk to a species.

252.   The Agencies expressly and heavily relied upon the NRLMD biological opinion in coming to their "no adverse modification" determinations for the lynx critical habitat affected by the challenged Projects.

253.   The Forest Service and the USFWS determined that the adverse modification effects of the East Boulder Project and the Bozeman Project would fall within the scope of effects analyzed in the 2007 1st tier biological opinion for the NRLMD and conform to the ITS prepared for that biological opinion.

254.   The NRLMD biological opinion and ITS allow a 6% exemption from the standards, which was used by the Agencies in this case

255.   For example, the USFWS explains that the impacts from the Projects would be "well within" the total acres allowed for fuels management in WUIs under the NRLMD, which constitutes 52,200 acres of allowable habitat destruction on a forest-wide scale.

256.   Thus, the "no adverse modification" determinations were couched in the assumption that the analysis in the NRLMD biological opinion was sufficient.  The brief critical habitat assessments outside of the NRLMD context were biased by this assumption and not independently sufficient to ensure that the Projects would leave adequate critical habitat to ensure both survival and recovery of the species.

257.   The Agencies are violating the ESA and NEPA with the authorization of both Projects by relying on a biological opinion and an ITS that completely fail to address effects of NRLMD management activities on lynx critical habitat on National Forest lands.

258.   Despite the fact that the NRLMD did not analyze lynx critical habitat on National Forest lands, the Forest Service argues, without reference to any authority, that all critical habitat for lynx on National Forest lands falls under the management direction of the NRLMD.

259.   As noted above, the NRLMD has never been analyzed to determine its direct, indirect, and cumulative effects on lynx critical habitat on National Forest lands.

260.   As noted above, the Agencies did not make up for this failure by assessing the direct, indirect, and cumulative effects of the NRLMD on lynx critical habitat on National Forest lands in the NEPA/ESA analysis for either challenged Project.

261.   The biological assessments, and biological opinion/ITS and letter of concurrence for the Projects violate the ESA because they are arbitrary and capricious and do not apply the best available scientific and commercial information, in part because they rely on the outdated/stale NRLMD biological opinion and ITS.

262.   The NEPA analyses for the Projects violate NEPA because they do not take

a hard look at impacts on lynx critical habitat on National Forest lands.  In

addition, the NEPA analyses for the Projects illegally tier to the NEPA analysis for

the NRLMD because none of the analyses address the cumulative effects of the

NRLMD on lynx critical habitat on National Forest lands.

263.   The Projects must be enjoined and the decisions must be set aside and

remanded for analysis that complies with the ESA and NEPA.

### THIRD CLAIM FOR RELIEF
The absence and/or inadequacy of a biological opinion and incidental take
statement for the Gallatin Forest Plan for grizzly bears on the Gallatin National
Forest outside of the recovery zone violates the ESA and NEPA.

264.   All above paragraphs are incorporated by reference.

265.   The Greater Yellowstone Area (GYA) grizzly bear is a threatened species

that lives in close proximity to humans and is thus referred to as a conservation-

reliant species, that is, a species that is at risk from threats so persistent that it

requires continuous management to maintain population levels.  Humans are the

"primary agent of death" for grizzlies.

266.   Section 7 of the ESA requires that the Forest Service engage in consultation

with USFWS regarding the impacts of the Gallatin National Forest Plan on ESA-

listed species, including threatened grizzly bears.  The agencies must prepare a

biological assessment and biological opinion to avoid causing jeopardy to the

ESA-listed species.

267.   Additionally, Section 9 of the ESA provides that no person may "take" a

listed species, including the threatened grizzly bear. Species listed under the ESA receive near-absolute legal protection against taking. "The term 'take' means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such contact."

268. The USFWS may issue an ITS for agency actions that are likely to cause take and/or jeopardy. This ITS must set forth the predicted impact to the species, reasonable and prudent measures required to minimize take, as well as terms and conditions required to implement those measures. The agency then must comply with the terms and conditions of the ITS to be exempted from the ESA's take prohibition and to rely on and tier to the analysis and conclusions in the biological opinion.

269. The Gallatin Forest Plan sets forth an ITS that only applies to grizzly bears within the Yellowstone grizzly bear recovery zone.

270. The Agencies admit that take of grizzly bears is most likely to occur outside of the Yellowstone grizzly bear recovery zone.

271. The only other Biological Opinion and ITS currently in effect and pertaining to management forest-wide for grizzly bears is the 2006 Travel Management Plan Biological Opinion and ITS.

272. However, the 2006 Travel Plan biological opinion only analyzed road densities for management actions within the recovery zone. The biological opinion

does not have specific road density standards outside of the recovery zone and instead uses secure habitat as a surrogate measure of take for bears outside of the recovery zone.

273.   Secure habitat is defined in the 2006 Travel Plan Biological Opinion as areas more than 500 meters from an open or gated motorized access route or reoccurring helicopter flight line from March 1st through November 30th.  Secure habitat must be at least 10 acres in size.

274.    The secure habitat standard is management direction from the conservation strategy that was explicitly developed for use once grizzly bears are delisted from the ESA.  This standard is not appropriate or applicable to relisted grizzly bears.

275.   If the 2006 Travel Plan analysis is intended to be the biological opinion and incidental take statement analyzing management effects on grizzly bears on the Gallatin National Forest outside of the recovery zone, the Agencies are not using the best available science in violation of the ESA.

276.   The conservation strategy itself states that its direction, including secure habitat direction, is only for use once the Yellowstone grizzly bear is delisted.

277.   Accordingly, unless and until the Yellowstone grizzly bear is delisted, the agencies must apply the best available science on measuring management impacts to grizzly bears set forth in IGBC guidelines and Schwartz et al 2010, which shows that both secure habitat and road densities *outside* of secure habitat must be

measured, including open route density, total route density, and core habitat.

278.   Moreover, the agencies apparently do not consider the 2006 Travel Plan analysis to be the forest-wide biological opinion and incidental take statement for grizzly bears outside the recovery zone.

279.   The ITS Terms and Conditions for the 2006 Travel Plan require the Forest Service to follow access management direction within the proposed action, including standards related to secure habitat.

280.   The analysis calls for 57% secure habitat in the Gallatin / Madison area outside of the recovery zone and 78.9% secure habitat in the Absaroka / Beartooth area outside of the recovery zone.

281.   The Agencies failed to discuss or apply the standards from the Travel Plan to the challenged Projects, thus indicating that the agencies do not consider this document to establish forest-wide protections for listed grizzly bears outside the recovery zone.

282.   In further support of this apparent position, the Forest Service states in the Projects' records that "[t]here are no standards specific to management for grizzly bears in the management areas associated with this project."

283.   There is currently no other forest-wide biological opinion or ITS in place for grizzly bears outside of the recovery zone aside.

284.   Because there is either no biological opinion and incidental take statement

analyzing management effects on grizzly bears on the Gallatin National Forest outside of the recovery zone, or the existing biological opinion and incidental take statement are inadequate because they rely on scientific standards for delisted bears, the Agencies are allowing and/or causing unpermitted take of grizzly bears outside the recovery zone and/or failing to ensure the survival and recovery of the grizzly bear in violation of the ESA.

285.   The Agencies are also violating NEPA by failing to take a hard look at direct, indirect, and cumulative management impacts on ESA-listed grizzly bears on the Gallatin National Forest outside of the recovery zone.

### FOURTH CLAIM FOR RELIEF
The Agencies' site-specific Project analyses regarding impacts on grizzly bears are arbitrary and capricious and violate the ESA, NFMA, and NEPA.

286.   All above paragraphs are incorporated by reference.

287.   The Agencies admit that take is likely to occur in the Bozeman Project area due to increased road densities and helicopter usage related to Project activities.

288.   The Forest Service and the USFWS state that effects of Project roads were not analyzed in the Project analyses because the effects of roads and road use were analyzed under the 2006 Gallatin National Forest Travel Management Plan biological opinion.

289.   Presumably, the Agencies' position is that the effects of the Projects on grizzly bears related to road activities fall within the scope of the  analysis in the

2006 Gallatin National Forest Travel Management Plan biological opinion.

290.    However, a key premise of the 2006 Travel Plan biological opinion analysis assumes/requires 57% secure habitat in the Gallatin / Madison area outside of the recovery zone and 78.9% secure habitat in the Absaroka / Beartooth area outside of the recovery zone.

291.    The Agencies failed to establish or even discuss whether the East Boulder and Bozeman Projects comply with the secure habitat requirements detailed in the 2006 Travel Plan ITS.

292.    The Bozeman Project included a site-specific ITS for helicopter logging. For impacts caused by helicopter use, the USFWS used a surrogate take measure, the duration of helicopter logging, to form the parameters of its ITS because the USFWS asserted that it was unable to quantify the numbers of grizzly bears that would be incidentally taken as a result of the Project.  Thus, the ITS appears to exempt take of an unlimited number of grizzlies for up to 144 days during the non-denning season and over a period of five concurrent years, irrespective of any road density increases.

293.    The USFWS notes that take related to helicopter use is likely triggered in this case by increases in road densities and explains that because the Bozeman Project will result in temporary increases in road densities, helicopter logging may contribute to the disturbance and increase the potential for incidental take caused

by these access changes.

294.   There are no specific analyses on the impact of road density increases on grizzly bears (including the 10.2 to 12.4 miles in increased open road density from the Bozeman Project), the Agencies have not demonstrated compliance with the Travel Plan ITS under either Project and thus cannot tier to it, and there is no ITS for other disturbance impacts likely to cause take.  Additionally, the anticipated take for Bozeman helicopter logging and burning is tied to increases in road density, but a surrogate measure of take appears to allow unlimited take of grizzlies during the 144 days of logging irrespective of road density increases.

295.   The Projects do not comply with the best available scientific threshold to maintain open road densities of one mile or less per square mile of habitat in grizzly bear habitat. The best available science on measuring management impacts to grizzly bears shows that both secure habitat and road densities outside of secure habitat should be measured, including open route density, total route density, and core habitat.   The Project analyses also fail to apply this best available science.

296.   Because there either is no incidental take permit and biological opinion addressing forest-wide management effects on grizzly bears outside of the recovery zone to apply to the Projects, or the Forest Service is simply refusing to acknowledge, discuss, and apply those requirements to the Projects, the Agencies' adverse effects analyses for the Projects (which must analyze jeopardy to the

population as a whole) are arbitrary and capricious, fail to apply the best available science, and violate the ESA, NFMA, and NEPA.

297. If the 2006 Travel Plan standards provide mandatory management direction, the Agencies are not using the best available science and causing unpermitted take in violation of the ESA, and failing to demonstrate compliance with forest-wide standards in violation of NFMA and NEPA.

298. The failure to adequately analyze and disclose Project impacts on the grizzly bear, especially the failure to address the road density thresholds that apply to these projects, violates NEPA.

**FIFTH CLAIM FOR RELIEF**
<u>The Forest Service is failing to ensure, and take a hard look at,
the viability of old-growth and snag dependent, sensitive, and
management indicator species in violation of NEPA and NFMA.</u>

299. All above paragraphs are incorporated by reference.

300. The provisions of a forest plan are legally enforceable under NFMA.

301. The Forest Plan requires that the Forest Service monitor population trends of MIS to determine population change.

302. The Forest Plan requires that the Forest Service maintain at least 10% old growth in each timber compartment on the Forest.

303. The Forest Plan requires the Forest Service to manage sensitive species habitat to maintain the species.

304. The Forest Plan has a snag objective of 30 snags per 10 acres.

305.   The Forest Service has not monitored and established population trends of MIS.

306.   The Forest Service is not meeting old growth standards in all of its timber compartments.

307.   The Forest Service is failing to manage sensitive species habitat to maintain the species and is not meeting its snag objectives for snag dependent wildlife.

**East Boulder Project**

308.   The inadequacy of the Forest Plan old growth standard at ensuring old growth species viability is illustrated by the lack of old growth dependent and management indicator species found in the East Boulder Project area.  Despite the Forest Service's assertion that it is meeting its old growth standard, the Forest Service does not have documented information on recent presence, nesting, or denning of the American marten or the Northern goshawk in the Project area.

309.   The Project authorizes further habitat fragmentation of the area.

310.   The Forest Service admits that the Project will degrade, eliminate, or render unsuitable various acreages of currently suitable habitat for the American marten and the Northern goshawk.  Both of these species are MIS for other old growth dependent and sensitive wildlife species.

311.   The Forest Service's reliance on a "habitat proxy" method of ensuring old growth species viability violates NFMA because the old growth standard is not

being met in at least one unit and this proxy has failed to mirror reality in the other

units.  Without population trend monitoring, as required by the Forest Plan, and

without recent documented presence of MIS, the Forest Service's reliance on

habitat modeling to evaluate the impact of Project activities on the viability of old

growth MIS and old growth dependent species (i.e. "proxy-on-proxy") is arbitrary

and a violation of NFMA.  Therefore, the Forest Service's approval of the East

Boulder Project, which will further degrade already rare habitat for these species,

is arbitrary and capricious and must be set aside.

312.   Compounding the adverse impacts to species diversity and viability from the

Forest Service's MIS failures, the Forest Service is also failing to maintain

sensitive species habitat and snag habitat.

313.   The Forest Plan has a snag objective of 30 snags per 10 acres on the Forest.

314.   Of the 89 10-acre plots surveyed in the Project area, 70 plots have no snags

available, 13 plots have only one snag available, and the remaining 6 plots only

have 2 or 3 snags per plot.  Not a single plot comes anywhere near the 30 snags per

plot objective.

315.   Several harvest *units* (larger than the 10 acre plots) scheduled for hand

thinning currently have no snags available anywhere in the unit for retention.

316.   The Forest Service admits that Project activities will further reduce the

number of existing snags, decrease the supply of live replacement trees, and

increase visibility of the few remaining snags making them more vulnerable to firewood cutters.

317.   The Forest Service has not monitored snag dependent and cavity nesting species in the Project area and does not have species records for these species.

318.   The Forest Service is violating Forest Plan objectives by moving farther away from snag objectives and failing to manage sensitive species habitat to maintain the species in violation of NFMA.

**Bozeman Project**

319.   Despite the Forest Service's assertion that it is meeting its old growth standard, the Forest Service does not have documented information on recent presence or nesting of the Northern goshawk in the Project area aside from one active nest confirmation.

320.   The Project authorized further habitat fragmentation of the area.

321.   The Forest Service admits that the Project will degrade, eliminate, or render unsuitable various acreages of currently suitable habitat for the American marten and the Northern goshawk.

322.   The Forest Service's reliance on a "habitat proxy" method of ensuring old growth species viability violates NFMA because the old growth standard has failed to mirror reality in the Project area.

323.   Without population trend monitoring, as required by the Forest Plan, and

without recent documented presence of MIS, the Forest Service's reliance on habitat modeling to evaluate the impact of Project activities on the viability of old growth MIS and old growth dependent species (i.e. "proxy-on-proxy") is arbitrary and a violation of NFMA.  Therefore, the Forest Service's approval of the Bozeman Project, which will further degrade already rare habitat for these species, is arbitrary and capricious and must be set aside.

**NEPA Violations**

324.   NEPA requires that federal agencies take a "hard look" at the Project's effects and fully inform the public and decision makers of those effects.

325.   The Forest Service failed to take a hard look at both Projects' effects when it relied on an unreliable proxy-on-proxy analysis and when it failed to fully inform the public and decision makers of the Project effects on MIS and sensitive species.

326.   The Forest Service does not have and/or does not disclose population trend data on its MIS.

327.   The approval of the Project is therefore in violation of NEPA, arbitrary and capricious, and must be set aside.

### SIXTH CLAIM FOR RELIEF
<u>The East Boulder Project violates Forest Plan big game winter range standards, Wildlife Standard 3 and Standard MA 11, and the analysis fails to adequately disclose Project impacts on big game habitat, in violation of NEPA and NFMA.</u>

328.   All above paragraphs are incorporated by reference.

329.   Forest Plan Wildlife Standard MA 11 requires the Forest Service to ensure

that timber harvest in winter range areas will enhance winter range capability.

330.   The Forest Service is violating Standard MA 11 because timber harvest in the Project area will reduce winter range capability.

331.   Forest Plan Wildlife Standard 3 requires the Forest Service to manage big game winter range to meet the forage and cover needs of deer, elk, moose, and other big game species.

332.   The Forest Service is violating Wildlife Standard 3 because Project activities will decrease winter thermal cover in an area important to mule deer and moose during the winter and because the mule deer population is decreasing in the Project area.

333.   Thermal cover is identified in the Forest Plan as a "key habitat component" for big game and must be mapped on a site-by-site basis during project area analysis.

334.   Thermal cover is defined in the Forest Plan as cover used by animals to ameliorate chilling of weather.  It is an essential habitat component to lessen effects of ambient temperature on big game species, thus reducing the amount of energy expenditure required for thermoregulation.

335.   The Project area contains important winter range for mule deer and moose.

336.   Winter range provides canopy cover that intercepts snow, blocks wind, and reduces snow crusting, making movement for big game less difficult.

337.   Mule deer rely heavily on these habitat features to avoid deep snow conditions and snow crusting.

338.   Project impacts will likely be long-term because it will take up to 40-60 years for sapling-sized conifers to reestablish thermal cover for mule deer and over 60 years to reestablish thermal cover for moose.

339.   The loss of thermal cover will make it difficult for deer and moose to reach important winter forage, and Project activities will destroy little alpine fir, an important forage source for moose.

340.   The elimination of hundreds of acres of winter range in the Project area coupled with the disturbance effects of winter logging and the already below-average population numbers for mule deer violates Wildlife Standard 3, Wildlife Standard MA 11, NFMA, and NEPA.

## SEVENTH CLAIM FOR RELIEF
The Forest Service's failure to consult with Montana DEQ regarding NPDES permit compliance and failure to inform the public whether the Projects comply with Montana DEQ requirements violate NEPA.

341.   All above paragraphs are incorporated by reference.

342.   The Ninth Circuit has held that "stormwater runoff from logging roads that is collected by and then discharged from a system of ditches, culverts, and channels is a point source discharge for which [a NPDES permit] is required."

343.   The Forest Service admits that the road systems used for the Projects include drainage features such as ditches and culverts.

344.   The purposes of NEPA are to inform the agency and the public, and to conduct analysis before a final decision is made.

345.   NEPA regulations require that the agency "[r]equest the comments of … [a]ppropriate State and local agencies which are authorized to develop and enforce environmental standards."

346.   The Forest Service has not requested the comments of the relevant state agency that manages NPDES permits – Montana DEQ – regarding how/if it should proceed with obtaining NPDES permits for each of the Projects.

347.   Instead, the Forest Service states that "if logging road stormwater discharge NPDES permits are required for the [Projects], the Gallatin National Forest will work with the Montana DEQ to obtain the permits prior to project implementation."

348.   The Forest Service does not disclose or explain to the public how it will ever determine whether DEQ requires the permits if it does not request comments from the DEQ on this issue.

349.   The Forest Service does not disclose or explain to the public how the public will ever know if the Projects comply with DEQ's permitting requirements if the Forest Service does not disclose that fact in the NEPA analysis.

350.   The Forest Service states that "[t]he DEQ Water Protection Bureau staff indicates that if the industrial stormwater form and process is used for forest road

NPDES permits the NOI, the application form, and SWPPP should be filed at least 90 day in advance of logging operations." There is no evidence in the project record that this statement is drawn from an actual communication with DEQ; instead it is likely a quotation of materials on DEQ's website.

351.   The Forest Service has provided no record of communication with Montana DEQ regarding NPDES requirements and compliance specific to each Project area.

352.   The Forest Service's failure to disclose to the public whether the Projects comply with NPDES permitting requirements is an evasion of public scrutiny and violates NEPA.

353.   The Forest Service's failure to seek comments from the Montana DEQ regarding any applicable requirements for the NPDES permitting process for each Project area violates NEPA.

**EIGHTH CLAIM FOR RELIEF**
<u>The Bozeman Project violates the Roadless Rule and NEPA by</u>
<u>allowing logging in the Gallatin Fringe Inventoried Roadless Area.</u>

354.   All above paragraphs are incorporated by reference.

355.   When it promulgated the Roadless Rule, the USDA identified Inventoried Roadless Areas ("IRA") as "biological strongholds for populations of threatened and endangered species."

356.   To protect these critical areas, the 2001 Roadless Rule prohibits logging and road building in roadless areas with very narrow exceptions.

357.   Logging of "generally small diameter timber" is allowed infrequently in IRAs only if the logging is needed to either improve habitat or to maintain / restore the natural characteristics of the ecosystem, and only if logging will maintain or improve roadless area characteristics.

358.   No road construction or timber harvesting has occurred with the Gallatin Fringe Roadless Area since the adoption of the Gallatin Land Management Plan.

359.   The Gallatin Fringe IRA is allocated to Management Area (MA) 12 in the Forest Plan. The management emphasis for MA 12 is wildlife and dispersed recreation and is listed as unsuitable for timber production.

360.   The Bozeman Project authorizes 200 acres of commercial logging in the Gallatin Fringe IRA followed by prescribed burning of an additional 1,324 acres. The Project also authorizes 2.25 miles of temporary road construction in the unroaded area outside of the IRA.

361.   The Forest Service notes that the Project focus is to reduce the risk of wildfire by reducing fuels, and there was no differentiation between the IRA lands and the rest of the watershed outside the IRA in choosing priority treatment areas. The Forest Service further explains that "[t]he rationale for fuel treatment within the IRA is the same as that for the rest of the project area, that is, to reduce the risk of severe and extensive wildfire in the municipal watershed and reduce the risk to life and property in the project area."

362.   This purpose is not listed within the Roadless Rule as an exception to the general prohibition against logging in an IRA.

363.   Furthermore, Region One data indicates that the current stand conditions in the IRA are natural, and the Forest Service has not demonstrated that the IRA contains fuel conditions outside the range of natural variability.  The Forest Service states that stands with a current basal of roughly 150 square feet per acre will be reduced to a basal area of 90 square feet per acre.  Stands with a current basal area of 85-150 square feet per acre will be reduced to 50 square feet per acre.

364.   Additionally, Project documents indicate that the Forest Service will not limit commercial logging in the IRA to small diameter trees, as required by the Roadless Rule.  The Project allows logging of a substantial amount of mature lodgepole pine and Douglas fir with a diameter at breast height ("dbh") of 10-20 inches, which is a size considered to be old growth for lodgepole pine (Green et al. (1991)).

365.   The Forest Service admits that several treatment prescriptions would "result in an obviously harvested stand, apparent to most visitors."  An area that has been "obviously" logged is not retaining natural characteristics, as required under the Roadless Rule.

366.   The Forest Service further admits that logging and burning within the IRA and road building in unroaded areas will impact natural characteristics of the area

for decades.  These natural characteristics are vital to roadless and wilderness designations and degradation of natural characteristics violates the Roadless Rule.

367.   The Forest Service's authorization of commercial logging in an IRA violates the Roadless Rule because old growth lodgepole will be logged, logging is not necessary to maintain or restore natural conditions,  and logging will degrade natural, roadless, and wilderness characteristics.

## **REQUESTS FOR RELIEF**

For all the above-stated reasons, Plaintiff respectfully requests that this Court:

    A. Declare that the Agencies have violated the law;

    B. Enjoin the implementation of the Projects;

    C. Award Plaintiffs their costs, expenses, expert witness fees, and reasonable attorney fees under the EAJA and/or the ESA; and

    D. Grant Plaintiff such further relief as may be just, proper, and equitable.

Respectfully submitted this 10th Day of April, 2012.

*/s/ Rebecca K. Smith*
Rebecca K. Smith
PUBLIC INTEREST DEFENSE CENTER, P.C.

Dana M. Johnson
NORTHERN ROCKIES JUSTICE CENTER, PLLC
(*pending admission pro hac vice*)

Attorneys for Plaintiffs