IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

**FILED**

APR 2 0 2020

Clerk, U.S. District Court
District Of Montana
Missoula

| | |
|---|---|
| ALLIANCE FOR THE WILD ROCKIES & NATIVE ECOSYSTEMS COUNCIL, <br><br> Plaintiffs, <br><br> vs. <br><br> LEANNE MARTEN, Regional Forester of Region One of the Forest Service, UNITED STATES DEPARTMENT OF AGRICULTURE, UNITED STATES FOREST SERVICE, and UNITED STATES FISH AND WILDLIFE SERVICE, an agency of the U.S. Department of the Interior, <br><br> Defendants. | CV 12–55–DLC <br><br><br> ORDER |

In 2013, the Court enjoined Federal Defendants United States Forest Service ("Forest Service") and United States Fish & Wildlife Service ("FWS") from implementing two projects in the Gallatin National Forest.  (Doc. 39 at 21.)  The Court determined that Federal Defendants violated the Endangered Species Act ("ESA") by failing to adequately assess impacts on Canada lynx ("lynx") critical habitat.  (*Id.*)  Now, the agencies argue that they have remedied the legal violations identified by the Court and move for a dissolution of the injunction so that the projects can go forward.  (Doc. 80.)  Plaintiffs argue that legal deficiencies remain and oppose the motion.  (Doc. 84.)  For the following

reasons, the Court will lift the injunction.

## BACKGROUND

Because the parties are familiar with the factual and procedural background of this case, the Court iterates only a brief summary here.   The Bozeman Municipal Watershed Fuels Reduction Project ("Bozeman Project") and the East Boulder Fuel Reduction Project ("East Boulder Project") (together, "the Projects") aim to reduce the severity and collateral effects of wildfires by way of logging, thinning, and prescribed burns.   (Docs. 81-1 at 6–7; 81-2 at 5.)   Both Projects will take place in areas designated as critical habitat to lynx.   (Docs. 81-1 at 9, 54; 81-2 at 9, 23.)

In 2013, pointing to its then-recent decision in *Salix*, the Court determined that the Forest Service had improperly failed to reinitiate consultation pursuant to ESA § 7(a)(2) on its Northern Rocky Mountains Lynx Management Direction ("Lynx Amendment") after Forest Service land was designated as lynx critical habitat.   *See Salix v. U.S. Forest Serv.*, 944 F. Supp. 2d 984 (D. Mont. 2013), *aff'd sub nom. Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075 (9th Cir. 2015) ("*Cottonwood*").   This shortcoming at the programmatic level also poisoned the agencies' site-specific analyses and conclusions.   Federal Defendants' Project-specific habitat assessments and opinions "inextricably" hinged on the standards and guidelines in the pre-designation version of the Lynx Amendment.   (Doc. 39

at 20–21.)   Therefore, the agencies' determination that the Projects would not adversely modify lynx critical habitat was inherently unreliable.   (*Id.* at 21.) Accordingly, the Court remanded the matter to the Forest Service to reinitiate consultation on the Lynx Amendment consistent with *Salix* and enjoined Federal Defendants from implementing the Projects, pending completion of the reinitiated consultation and "any further procedures that might be required under the National Environmental Policy Act in light of the findings from that consultation."   (*Id.* at 47.)

Now, Federal Defendants ask the Court to lift the injunction based on their completion of both programmatic and site-specific ESA § 7 consultations.   (Doc. 81 at 6–7.)   On a programmatic level, FWS issued a post-designation biological opinion that "the effects of the [Lynx Amendment] are not likely to result in the destruction or adverse modification of designated Canada lynx critical habitat." (Doc. 81-3 at 32.)   Similarly, FWS made "no-adverse modification" findings on the site-specific tier for each Project.   (Docs. 81-5 at 7 (Bozeman Project); 81-6 at 7 (East Boulder Project).)   Finally, the Forest Service contends that its National Environmental Policy Act ("NEPA") analysis remains sufficient in light of this series of consultations.   (Doc. 81 at 13.)

For their part, Plaintiffs do not dispute whether, procedurally, the agencies

have completed the necessary ESA § 7 consultations.[1]   (Doc. 84 at 4.)   They insist, though, that substantive legal deficiencies still exist.   (*Id.*)   Plaintiffs aver that the "new biological assessments and biological opinions [fail] to adequately assess impacts on lynx critical habitat."   (*Id.* at 5.)   Specifically, Plaintiffs say this failure is in the lack of detailed analyses "of impacts to each of the primary constituent elements []—with matrix habitat [] getting an especially cursory review."   (*Id.*)   And, because the agencies purportedly have yet to take "a hard look at the effects of the [Projects] on designated lynx critical habitat," they further challenge the Forest Service's conclusion that no further analyses under NEPA is required.   (*Id.* at 84.)

## LEGAL STANDARDS

### I.   Injunction Dissolution

This Court "retains the power to modify the terms of its injunction in the event that changed circumstances require it."   *United States v. Oregon*, 769 F.2d 1410, 1416 (9th Cir. 1985) (citations omitted).   A court may "relieve a party or its legal representative from a final judgment, order, or proceeding [if] the judgment

---

[1] Based on the parties' concurrence on this issue, Federal Defendants also argue that their completion of ESA § 7 consultations renders Plaintiffs' claims moot.   However, the Court agrees with Plaintiffs that a live controversy exists as to whether the "agencies [have] shown that the Projects will not reduce the functionality of lynx critical habitat by [] altering the primary constituent elements of lynx critical habitat to an extent that appreciably reduces the conservation value of the critical habitat[.]"   Doc. 39 at 16.   Accordingly, the Court rejects Federal Defendants' mootness argument.

has been satisfied, released or discharged."   Fed. R. Civ. P. 60(b)(5).   A party seeking a dissolution of an injunction may demonstrate that the change is warranted by showing "a significant change either in factual conditions or in law." *Alliance for the Wild Rockies v. Weldon*, 2011 WL 3348000, at *2 (D. Mont. Aug. 3, 2011) (quoting *Rufo v. Inmates of Suffolk Cty. Jail*, 502 U.S. 367, 384 (1992)). A significant change in facts occurs when a party demonstrates its compliance with a court's remand order.   *Sharp v. Weston*, 233 F.3d 1166, 1170 (9th Cir. 2000).

## II.   Administrative Procedure Act

Agency decisions under the ESA, like biological opinions, are governed by the Administrative Procedure Act ("APA"), "which requires an agency action to be upheld unless it is found to be 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.'"   *Pac. Coast Fed'n of Fisherman's Ass'n, Inc. v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028, 1034 (9th Cir. 2001) (quoting 5 U.S.C. § 706(2)(A); *Friends of the Earth v. Hintz*, 800 F.2d 822, 830–31 (9th Cir. 1986)).   The scope of review under this standard is "narrow and a court should not substitute its own judgment for that of the agency."   *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).   Therefore, a court should overturn agency action only when the agency:

> [H]as relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a

difference in view or the product of agency expertise.

*Id.*   At bottom, then, a court must ask "whether the agency considered the relevant factors and articulated a rational connection between the facts found and the choice made."   *Pac. Coast Fed'n of Fisherman's Ass'n, Inc.*, 265 F.3d at 1034 (citations and internal quotation marks omitted).

Finally, and pertinent to the instant issue, "[a] biological opinion may also be invalid if it fails to use the best available scientific information as required by 16 U.S.C. § 1536(a)(2)."   *Id.* (citation omitted).   Nevertheless, "[w]hen examining this kind of scientific determination . . . a reviewing court must generally be at its most deferential."   *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 592–93 (citation omitted) (alterations in original).

## ANALYSIS

Urging the Court to leave the injunction intact, Plaintiffs challenge the agencies' purportedly "cursory analyses [which fail to] provide the level of detail required to ensure critical habitat will not be altered to an extent that appreciably reduces the conservation value of the habitat."   (Doc. 84 at 5–6.)   To determine whether the agencies' analyses and conclusions meet statutory muster, the Court first turns to the ESA and its implementing regulations.   The Court will then address whether further procedures are required under NEPA.

## I.      Endangered Species Act

The Endangered Species Act is intended to protect and conserve endangered and threatened species and their habitats. *Nt'l Ass'n of Home Builders v. Defs. Of Wildlife*, 551 U.S. 644, 651 (2007); 16 U.S.C. § 1531(b).   To ensure that their actions do not undermine those goals, federal agencies must follow the steps prescribed by § 7 of the ESA and its corresponding regulations. *Nt'l Ass'n of Home Builders*, 551 U.S. at 652.   When the action-proposing agency—the Forest Service here—determines in a biological assessment that the action "may affect" a listed species or critical habitat, it must initiate a consultation with the appropriate wildlife agency—here, FWS[2]—as delegate of the Secretary of the Interior.   16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a)–(b), (g).

Next, the wildlife consulting agency prepares a biological opinion "setting forth the Secretary's opinion, and a summary of the information on which the opinion is based, detailing how the agency action affects the species or its critical habitat."   16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(h).   If the consulting agency determines that the action is "[n]ot likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification[3] of

---

[2] For ESA consultation on freshwater or land-based species, such as the lynx, the consulting agency is FWS. For marine or anadromous species, the consulting agency is the National Marine Fisheries Service. *See* 50 C.F.R. § 402.01.

[3] The regulations under § 7 define "destruction or adverse modification" as "a direct or indirect alteration that appreciably diminishes the value of critical habitat as a whole for the conservation of a listed species."   50 C.F.R. § 402.02.   Adverse effects on primary constituent elements,

critical habitat (a 'no jeopardy' biological opinion)," both agencies have fulfilled their respective obligations and the federal action may proceed.   50 C.F.R. § 402.14(h)(iv)(B).

Plaintiffs argue that FWS's biological opinions—concluding that the Projects would not appreciably reduce the conservation value of lynx critical habitat—lack required detail under 50 C.F.R. § 402.02.   (Doc. 84 at 6.)   As a preliminary matter, § 402.02 "is a definitional section; it is defining what constitutes [a biological opinion], not setting out hoops that the FWS must jump through."   *San Luis & Delta-Mendota Water Auth.*, 747 F.3d at 635 (citations omitted).   Instead, § 402.14 sets out the hoops through which FWS must jump when a formal consultation is required:

> The biological opinion shall include: (i) [a] summary of the information upon which the opinion is based; (ii) [a] detailed discussion of the environmental baseline of the listed species and critical habitat; [and] (iii) [a] detailed discussion of the effects of the action on a listed species or critical habitat.

50 C.F.R. § 402.14(h).   Plaintiffs point to FWS's *Consultation Handbook* to suggest that the biological opinions here fail to satisfy subsection (iii).   (Doc. 84 at 6–8.)

---

*infra*, "generally do not result in . . . adverse modification determinations unless that loss . . . is likely to . . . appreciably diminish the capability of the critical habitat to satisfy essential requirements of the species."   *Butte Envtl. Council v. U.S. Army Corps of Eng'rs*, 620 F.3d 936, 948 (9th Cir. 2010) (citation omitted).

While the Court recognizes that this Circuit has afforded *Skidmore*

deference[4] to FWS's *Consultation Handbook, San Luis & Delta-Mendota Water*

*Authority*, 747 F.3d at 634–35, it finds Plaintiffs' reliance on the *Handbook*'s

factors to inject additional obligations into the formal consultation process beyond

those set out in § 402.14 unpersuasive.   Courts "must be reluctant to mandate that

a federal agency step through procedural hoops in effectuating its administrative

role unless such procedural requirements are explicitly enumerated in the pertinent

statutes [and regulations.]"   *Wilderness Soc. v. Tyrrel*, 918 F.2d 813, 818 (9th Cir.

1990).   Indeed, the Ninth Circuit has rejected efforts to insert specific

requirements for biological opinions beyond those found in the ESA and its

implementing regulations: "they require only that the FWS evaluate the current

status of the listed species or critical habitat, the effects of the action, and the

cumulative effects on the listed species or critical habitat."   *Butte Envtl. Council v.*

*U.S. Army Corps of Eng'rs*, 620 F.3d 936, 948 (citing 50 C.F.R. § 402.14(g)(2)–

(3)) (internal quotation marks omitted).

Furthermore, Plaintiffs' recitation of the *Consultation Handbook*'s "[f]actors

to be considered" notwithstanding (Doc. 84-1 at 104),[5] the Court cannot agree that

---

[4] *See Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944) (holding that, while the "rulings,
interpretations, and opinions of the [Fair Labor Standards Act Administrator]" are not
controlling, they "do constitute a body of experience and informed judgment to which courts and
litigants may properly resort for guidance").

[5] Plaintiffs also enumerate the *Consultation Handbook*'s "considerations" related to species'
response to proposed action, which they concede in a footnote "can be addressed in terms of the

FWS failed to meet its duty to engage in a detailed discussion of the effects of the Projects on lynx critical habitat. To explain why, the Court sets aside Plaintiffs' sweeping and unsupported claim of inadequacy—"the new biological opinions consider some factors . . . [but] fail to consider other factors in detail, or in relation to one another, or provide information about how project activities will affect the species and its habitat on the ground"—and focuses on the only aspect of the biological opinions they specifically dispute: the matrix habitat analysis. (Doc. 84 at 8–14.)

## A. Matrix Habitat

It is FWS's formulation of matrix habitat—as, essentially, a thoroughfare for lynx moving between foraging and denning habitats—that undercuts Plaintiffs' opposition to lifting the injunction. As both the *Consultation Handbook* and Federal Defendants emphasize, "[t]he biology comes first," and biology is where the Court will begin, too. (Doc. 84-1 at 27.)

In designating critical habitat, the Secretary of the Interior—through FWS as its delegate— "identif[ies] physical and biological features essential to the conservation of the species at an appropriate level of specificity using the best available scientific data." 50 C.F.R. § 424.12(b)(1)(ii); 16 U.S.C.

---

[Projects'] effect on the functional suitability of the habitat to support the species." (Docs. 84-1 at 111; 84 at 7.)

§ 1533(a)(3)(A)(i).   These "physical or biological features" comprise the primary constituent elements ("PCEs"), and are defined as "[t]he features that support the life-history needs of the species, including but not limited to, water characteristics, soil type, geological features, sites, prey, vegetation, symbiotic species, or other features."   *Id.* § 424.02.   The PCEs "may be a single habitat characteristic, or a more complex combination of habitat characteristics," and "may include habitat characteristics that support ephemeral or dynamic habitat conditions."   *Id.* Further, "[t]he [ESA] contemplates the inclusion of areas that contain PCEs essential for occupation by the [particular species], even if there is no available evidence documenting current activity."[6]   *Alaska Oil & Gas Ass'n v. Jewell*, 815 F.3d 544, 556 (9th Cir. 2016).

The ESA's implementing regulations expressly afford agency discretion in the formulation of PCEs, "which is clearly [a] decision within the scientific expertise of [FWS]."   *Wildearth Guardians v. U.S. Dept. of the Interior*, 205 F. Supp. 3d 1176, *1185 n. 4 (D. Mont. 2016) (citing 50 C.F.R. §§ 424.02, 424.12(b)(1)(ii)).   To that end, FWS has identified the following PCE specific to lynx in the contiguous United States:

(1) Boreal forest landscapes supporting a mosaic of differing successional forest stages and containing:

---

[6] No lynx have been observed in the Bozeman Project area since 1963.   (Doc. 81-1 at 14–15.) Similarly, the lynx population in the East Boulder Project area is "very small – likely fewer than 10 lynx, and possibly zero."   (Doc. 81-2 at 8.)

(a)   Presence of snowshoe hares and their preferred habitat conditions, which include dense understories of young trees, shrubs or overhanging boughs that protrude above the snow, and mature multistoried stands with conifer boughs touching the snow surface;

(b)   Winter conditions that provide and maintain deep fluffy snow  for extended periods of time;

(c)   Sites for denning that have abundant coarse woody debris, such as downed trees and root wads; and

(d)   Matrix habitat (e.g., hardwood forest, dry forest, non-forest, or other habitat types that do not support snowshoe hares) that occurs between patches of boreal forest in close juxtaposition (at the scale of a lynx home range) such that lynx are likely to travel through such habitat while accessing patches of boreal forest within a home range.

50 C.F.R. § 17.95-a; Endangered and Threatened Wildlife and Plants; Revised Designation of Critical Habitat for the Contiguous United States Distinct Population Segment of the Canada Lynx and Revised Distinct Population Segment Boundary, 79 Fed. Reg. 54,782-01, at 54,811–12 (Sept. 12, 2014) ("2014 Final Rule").   In other words, the PCE for lynx critical habitat is boreal forest landscapes containing four "subcomponents": PCE 1a (snowshoe hares and their habitat); PCE 1b (winter conditions); PCE 1c (denning sites); and PCE 1d (matrix habitat).   (Doc. 81-4 at 22–24.)

Of the four subcomponents, PCE 1a holds priority from a conservation standpoint.   That is, "[s]nowshoe hare density is the most important factor explaining the persistence of lynx populations."   2014 Final Rule at 54,807.

FWS explains that it is "aware of no lynx populations that persist in areas where prey other than showshoe hares contribute a majority of the biomass of the lynx diet." *Id.* at 54,784.   For that reason, "section 7 consultations addressing the jeopardy standard for lynx . . . likely will continue to[] focus largely on potential impacts to snowshoe hare (i.e., lynx foraging) habitats." *Id.* at 54,800.   Matrix habitat, by definition, does not support snowshoe hare habitat; therefore, then, agencies appropriately—and expectedly—afford less focus to PCE 1d in § 7 consultations that address whether a proposed project will adversely modify lynx critical habitat.

Here, relying on the best available scientific data as it relates to the role matrix habitat plays in lynx conservation, Federal Defendants engaged in sufficiently detailed analyses beginning with the programmatic documents.   To refresh, the Projects propose to achieve their wildfire-reduction objectives by way of "partial harvesting and thinning in mature stands, mechanical and hand thinning and piling of younger trees, prescribed burning after thinning, and broadcast burning in more open stands"—i.e., vegetation management activities.   (Docs. 81-1 at 6–7; 81-2 at 5.)   The Forest Service's biological assessment of the Lynx Amendment (Doc. 81-4 at 19) relied on FWS's determination that, "[i]n matrix habitat, activities that change vegetation structure or condition would *not* be considered an adverse effect to lynx critical habitat unless those activities would

- 13 -

create a barrier or impede lynx movement between patches of foraging habitat and

between foraging and denning habitat[.]"   2014 Final Rule at 54,827 (emphasis

added).   In its biological opinion, FWS confirmed the Forest Service's

programmatic assessment by explaining why the Lynx Amendment lacked

vegetation management guidelines and standards specific to matrix habitat.   (Doc.

81-3 at 19.)   Pointing to the 2014 Final Rule, FWS opined:

> While vegetation management activities may effect vegetation within
> PCE 1d, we do not expect that such activities would affect the ability
> of a lynx to travel through such habitat *because vegetation management
> is not likely to create a barrier or impede lynx movement between
> patches of foraging habitat and between foraging and denning habitat
> within a potential lynx home range.*"

(Doc. 81-3 at 20 (emphasis added).)   Accordingly, FWS concluded, "the effects

from vegetation management that occur within PCE 1d would be insignificant."

(*Id.*)

Furthermore, while the Lynx Amendment does not include explicit

vegetation standards and guidelines specific to matrix habitat, it nevertheless

includes a sweeping mandate that implicitly promotes the conservation value of

PCE 1d to lynx critical habitat.   Standard ALL S1—applicable to all projects in

lynx critical habitat—requires that "vegetation management projects must maintain

habitat connectivity in an LAU [lynx analysis unit] and/or linkage area."   (Doc.

81-4 at 59.)   Applying ALL S1 "minimizes the potential impacts to habitat

connectivity and linkage areas [matrix habitat] from vegetation management."

(Doc. 81-3 at 20.)   Therefore, FWS affirmed that it does "not expect habitat connectivity or linkage to be adversely affected from vegetation management projects."   (*Id.*)

The Court cannot agree with Plaintiffs' insistence that the programmatic biological analyses of the Lynx Amendment provide problematically "cursory" review of the impact vegetation activities—like the ones proposed here—would have on matrix habitat.   (*See* Doc. 84 at 6, 9.)   That the agencies decline to consider factors immaterial to the conservation value of PCE 1d does not mean that their decision-making was arbitrary and capricious, an abuse of discretion, or contrary to law.   *See Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1075 (9th Cir.), *amended*, 387 F.3d 968 (9th Cir. 2004), *superseded on other grounds by Regulation as stated in Alliance for the Wild Rockies v. Savage*, 783 Fed. Appx. 756 (9th Cir. 2019).

By definition and expectation, matrix habitat is not the focus in conducting § 7 consultations on lynx habitat.   So long as they do "not create a barrier or impede lynx movement between patches of foraging habitat and between foraging and denning habitat," vegetation activities are *not* considered to adversely affect lynx critical habitat.   2014 Final Rule at 54,827.   Federal Defendants need not consider a litany of factors irrelevant to the value of matrix habitat, nor offer further explanations as to why, say, matrix habitat is excluded from adjusted

thresholds for treatment areas in the Wildland Urban Interface (*see* Doc. 84 at 8–9).   The Court is satisfied that the agencies applied the best available scientific data to determine that, based on definition and conservation role of matrix habitat, vegetation activities are not likely to adversely impact PCE 1d.

Turning, then, to the Project-specific § 7 consultations, the Court reaches the same conclusion: Federal Defendants made repeated and adequately detailed findings that the Projects would have insignificant effect on matrix habitat.   The Court bears in mind here, and as FWS iterates in its biological opinions, the site-specific consultations are "second-tier" consultations.   (Docs. 81-5 at 2–3; 81-6 at 5.)   In other words, programmatic § 7 consultations affect consultations on implementing projects: "In issuing its biological opinion on an action, [FWS's] finding under section 7(a)(2) entails an assessment of the degree of impact that an action will have on a listed species.   Once evaluated, that degree of impact is factored into all future section 7 consultations conducted in the area." *Cottonwood*, 789 F.3d at 1082, n.9 (quoting Interagency Cooperation–Endangered Species Act of 1973 as Amended; Final Rule, 51 Fed. Reg. 19,926–01, 19,932 (June 3, 1986)).

That the site-specific biological opinions tier to, or incorporate, the programmatic assessment and opinion is particularly relevant in this case.   As already summarized, the Court enjoined the Projects in 2013 based on Federal

Defendants' reliance on the then-flawed Lynx Amendment in their site-specific analyses.   (Doc. 39 at 21.)   Now, however, the agencies have completed the reinitiated § 7 consultation on the Lynx Amendment pursuant to *Cottonwood*. (Docs. 81-4; 81-3.)   Therefore, the Court no longer views as problematic that the Project-specific analyses are tiered to the assessment and opinion on the Lynx Amendment.

With tiering in mind, then, the Court finds that the agencies engaged in the requisite "detailed discussion" of the Projects' impact to matrix habitat, pursuant to 50 C.F.R. § 402.14(h)(iii).   And, because Plaintiffs lob only a conclusory objection to the East Boulder biological opinion (Doc. 84 at 14), the Court focuses specifically, as they do, on the Bozeman Project's biological opinion.   As an initial matter, the Court will not rehash its discussion, *supra*, regarding the level of scrutiny the agencies afford matrix habitat, as opposed to the other limiting subcomponents of lynx PCE.   And, for the same reasons, the Court rejects Plaintiffs' claim that the East Boulder Project analyses improperly give matrix habitat "lesser consideration."   (*See* Doc. 84 at 11.)

Furthermore, looking to the site-specific documents, the Court cannot agree with Plaintiffs' criticism of the scrutiny with which the agencies examined the impact to PCE 1d.   The Bozeman Project area includes about 1,293 acres of matrix habitat.   (Doc. 81-1 at 41.)   While the Forest Service acknowledges that its

- 17 -

vegetation activities would result in "temporary alteration of matrix habitat and likely alter use patterns," it nevertheless concludes that the Project "would not pose barriers to lynx movement [and] [h]abitat connectivity would be maintained[.]" (*Id.*)

Emphasizing the importance of habitat connectivity, especially in the North Gallatin Lynx Analysis Unit ("LAU"), the Forest Service explains that the Bozeman Project is not considered a part of the designated linkage area for the LAU. (*Id.* at 23.) Still, while the Project area is "not in a known or suspected linkage area," the proposed fuel reduction treatments "would still leave enough trees standing to provide adequate cover to maintain travel and resting habitat for lynx." (*Id.*) Additionally, while the Bozeman Project includes ridgeline fuel breaks for strategic firefighting purposes, the Forest Service concludes that due to their "width [about 200 feet on either side of affected ridges] and the structure that would be retained, the [] fuel breaks would not be considered a barrier to lynx movement across the landscape." (*Id.* at 24.) Further, "[t]here are no plans to maintain these fuel breaks in the foreseeable future." (*Id.* at 7.) After thoroughly accounting for the Bozeman Project's impacts to habitat connectivity, the Forest Service concluded that "there would be no barriers to lynx movement created." (*Id.* at 25.) Therefore, the Forest Service concludes that "the effect to critical habitat as a result of activities in matrix would be insignificant." (*Id.*)

FWS confirms the conclusion reached by the Forest Service, vis-à-vis matrix habitat.   It affirms that the Bozeman Project will alter structural stages of potential lynx habitat.   (Doc. 81-5 at 4.)   However, like the Forest Service, FWS determines that the Bozeman Project "would not impede lynx movement and will not reduce habitat connectivity.   The proposed action is not expected to preclude any future use of the area by a resident lynx (if present) or a transient lynx should they pass through the area."[7]   (*Id.*)

Again, by definition, matrix habitat is non-foraging, non-denning habitat through which lynx are likely to travel while accessing patches of boreal forest. 50 C.F.R. § 17.95-a; 2014 Final Rule at 54,811–12.   And, to reiterate, FWS has determined that the vegetation activities—like those the Projects propose— would not affect the ability of a lynx to travel through matrix habitat, "because vegetation management is not likely to create a barrier or impede lynx movement between patches of foraging habitat and between foraging and denning habitat within a potential lynx home range."   (Doc. 81-3 at 20.)   Without some evidence that activities that do *not* create a barrier or impede movement nevertheless may adversely impact matrix habitat, the Court will not second-guess FWS.   *See Gifford Pinchot Task Force*, 378 F.3d at 1075.   The Project-specific assessments

---

[7] *See* n.6, *supra* (stating that lynx have not been observed in the Bozeman Project area since 1963).

and opinions, tiered to the programmatic documents, provide thorough analysis and conclusions that the Projects would not impede lynx movement—the *only* functional element of matrix habitat.

Although Plaintiffs would have the agencies turn over analytical stones irrelevant to matrix habitat's function as a thoroughfare, that the agencies declined to do so does not mean that their decision-making was arbitrary and capricious, an abuse of discretion, or contrary to law.   In sum, the Court finds that Federal Defendants have complied with the ESA and its implementing regulations and have adequately demonstrated that the Projects will not appreciably reduce the conservation value of lynx critical habitat.

## II.   National Environmental Policy Act

NEPA has a twofold goal.   First, it "ensure[s] [a federal] agency will have detailed information on significant environmental impacts when it makes its decisions."   *Inland Empire Pub. Lands Council v. U.S. Forest Serv.*, 88 F.3d 754, 758 (9th Cir. 1996).   Second, it "guarantee[s] that this information will be available [to the public]."   *Id.*   NEPA "does not mandate particular results, but simply describes the necessary process that an agency must follow in issuing an [environmental impact statement]."   *Westlands Water Dist. v. U.S. Dept. of Interior*, 376 F.3d 853, 865 (9th Cir. 2004) (citation omitted).   Rather than passing judgment on the substance of the agency's decision, a court's "focus must be on

- 20 -

ensuring that agencies took a 'hard look' at the environmental consequences of their decisions." *Id.* While the court's inquiry must be "searching and careful[,] . . . the ultimate standard of review is a narrow one." *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 378 (1989) (internal quotation marks omitted).

NEPA requires that a federal agency supplement an environmental impact statement if "[t]here are new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1)(ii). But, where the agency "having taken a hard look at reevaluation, determines that the new impacts will not be significantly different from those already considered," no supplementation is required. *Idaho Wool Growers Ass'n v. Vilsack*, 816 F.3d 1095, 1107 (9th Cir. 2016) (citation and internal quotation marks omitted).

Plaintiffs argue that, because Federal Defendants have failed to remedy their ESA violation, NEPA's "hard look" requirement likewise remains unsatisfied. (Doc. 84 at 16.) However, as already explained, the Court finds that the agencies have now satisfied their statutory and regulatory obligations under the ESA. Be that as it may, the Forest Service appropriately evaluated whether it should undertake further procedures under NEPA's supplementation mandate following its triad of revised ESA consultations. For example, after considering and summarizing new information, the Forest Service concluded that "supplementation

is not needed because the revised analysis and conclusions indicate that the

potential impacts from the [Bozeman Project] are within the scope and range of the

effects previously disclosed in the original analysis." (Doc. 81-7 at 4.) The

agency reached the same conclusion regarding the East Boulder project. (Doc.

81-10 at 4.) Through its narrow scope of review under NEPA, the Court finds that

the Forest Service took the requisite hard look at the environmental consequences

of the Projects.

Again, Plaintiffs raise no dispute that the agencies adequately engaged in

post-consultation NEPA evaluations; instead, they only insist that the underlying

ESA violation remains. However, the Court disagrees with the Plaintiffs on the

ESA issue, and the Court finds that the Forest Service properly evaluated whether

additional NEPA procedures were necessary to conclude that they are not.

## ORDER

For the foregoing reasons, IT IS ORDERED that the motion (Doc. 80) is

GRANTED. Accordingly, the injunction issued on June 25, 2013 (Doc. 39 at 47)

is DISSOLVED. Federal Defendants are no longer enjoined from implementing

the East Boulder Project and the Bozeman Project.

Dated this 20th day of April, 2020.

Dana L. Christensen, District Judge
United States District Court